Case number 23-3166. United States of America v. Darrell Neely, appellants. Mr. Anzina for the appellant, Mr. Hill for the appellee. Good morning, Your Honors. May it please the Court. I'm Paul Anzina. I represent the appellant, Darrell Neely. Mr. Neely is a journalist who hosts an online news show and it was in that capacity that he went to the Capitol on January 6th to observe and report. He did not bring any signs. He did not wear any kind of equipment. He did not bring any weapons. As I said, he was there to observe and report. What relevance does that have to any of the legal issues we are resolving today? It has no specific relevance to the legal issues, Your Honor. All right. After January 6th, Mr. Neely was interviewed twice by the FBI. Both cases he cooperated fully, answered all their questions, and even supplied them with evidence. Several months later, he was arrested and he was met with agents who engaged him in a conversation. After that conversation, he was given his Miranda warnings and then they conducted a videotaped interrogation. He was charged with six crimes, went to trial before Judge Bates, a bench trial, was acquitted on one crime, one allegation, that's civil disorder, but convicted on the rest and he was sentenced to 28 months in prison altogether. I've raised three issues on appeal. First, the district court erred in denying motion to dismiss counts three and four. Second, the district court erred in denying the motion to suppress the interrogation. And third, the district court erred in denying the motion to transfer venue. And I'd like to start with that third point, the motion to transfer venue. Several months ago, the court filed a Rule 28J letter with the court regarding that this court's decision in the United States versus Webster, number 22-3064, where the court rejected a similar venue challenge. In that case, the court held that the court rejected the argument that the entire jury pool was presumptively prejudiced against the defendant in that case. And that is an argument that we made here and that is addressed by the Webster Court. However, the Webster decision leaves open several of our arguments. In order to determine the presumptive prejudice of a jury pool, the court looks at a number of different factors. One is the size and characteristics of the jury pool. That, I believe, is foreclosed by Webster. But the others are the nature and extent of pretrial publicity and the proximity of time between the events and the publicity and the trial. Now here, what's different is that the nature and extent of pretrial publicity are different because in Webster, court held that January 6 coverage generally is not sufficient to create that presumptive prejudice. However, in this case, appellant Mr. O'Neilly was singled out and Rolling Stone published an article about him that was incorrect that alleged that he was selling souvenirs from January 6th and that he had smoked marijuana in the Capitol. Why can't that be addressed in voir dire? If there's usually a question have of the of the veneer panel. Have you heard any coverage about this case? And if they answer yes, you can follow up and you could be right here for that reason. That particular issue, I believe, can be addressed in voir dire. Um, but the other issue is that the question of the proximity between the, um, publicity and the trial here, what happened is Mr O'Neilly's trial was two and a half years after January 6th, and in Webster, the trial was a year after January 6th. Now, you might look at that and think, well, gee, this is even more time that's elapsed, so that's an even weaker argument. But here, Mr. O'Neilly's trial occurred in the middle of the televised hearings by the House Select Committee on January 6th, and the passage of time here between January 6th and the time of the trial exacerbated the prejudice here because if you look at what happened with the object on that basis in the court below, did he make a motion based on the January 6 hearings? Because that's different from general publicity about January 6th. Well, it is. And the argument I'm making is not based on the publicity from the proximity of time. And did he object on that basis that this trial is happening while these hearings are taking place? Therefore, it's unfair to me, Your Honor. I'm afraid I can't answer that question. I don't I don't know the answer whether he specifically objected. But do you agree that he would have to specifically object to that in order to rely on it here? I think unless it must have a clear error. Or plain error. Plain error. I'm sorry. Okay. Plain error. But but but even if let's assume for the sake of argument that he made that specific objection below, why isn't that also something that can just be taken care of in or dear? I mean, we've had trials in this courthouse relating the Watergate. We've had trials in this courthouse relating to Iran Contra. Um, um, lots of things where there have been televised congressional hearings, front page news center. That is correct, Your Honor. But what I would those events like Watergate Watergate happened 50 years ago. The Iran Contra scandal took place 40 years ago. The news media ecosystem is different today. It is all encompassing. It is 24 7. It's constant. And January six has been in the news every day since January six. And the January six hearings were a huge event. Um, I believe the first hearing drew something like 25 million viewers, which is something like not Super Bowl caliber, but along the level of, say, a Monday night football game, which is a huge number of people. And the statistics show that D. C. Residents pay more attention to January six and other people. In all likelihood, much greater proportion of D. C. Residents watched all those hearings. And Mr Neely's trial occurred after eight of those televised hearings and before the ninth. So in that situation, I think Webster is distinguishable because Webster went to trial. It was in the early stages of January six. A lot of people were talking about things like it was just a slapdash haphazard event. Just kind of got out of control. But what they did with the January six committee hearings did was they they threw water cold water on that because what they they conducted a detailed forensic analysis of everything that happened. They had thousands of witnesses, thousands of documents, and they talked about all the extensive violence that happened that day. Conspiracies activity to undermine democracy. And I would I would submit that those events exacerbated the privilege, even though more time had passed. What? What evidence was put before the district court in support of the motion to transfer venue? Your Honor, I think that would that the motion to transfer venue raised the same issues I'm raising here today, which is that I think what what it relied on primarily was the notion that the D. C. Ward here was overwhelmingly prejudiced against. But I understand that argument. But what evidence was put before the district court? What evidence is in the record to support that? What polling data? What surveys your honor? The polling data took place. I believe the polling data took place prior to the January six committee hearings. So I don't believe that polling data supports this argument, frankly. Uh, and the polling data, I believe at least one of the polls that we put that the defendant put forward before the district court was was expressly rejected by the Webster court. I guess the I think to me, one challenge you have is that, you know, be one thing if if if you had attempted for dear below you, meaning meaning Mr Neely's counsel below had attempted for dear and we're having trouble finding jurors. Um, or there was some polling or survey data. Um, that, um, demonstrated it would be difficult to find, you know, a fair and impartial jury pool. Um, but if the data that was put before the district court is not really materially different than the data that was put before the district court in Webster that we rejected. Um, I'm not sure how how how do we get around that? Your honor, I think the only I think what does distinguish this case from Webster is the timing of the trial. And that that was that was before the court in the sense that it was occurring when it was occurring. The court knew that those periods had taken place. That's all I can understand. I'd like to turn if I may to the motion to dismiss and specifically the second argument I raised in that, um, I made two arguments on the motion to dismiss. One was that the statute requires that the Secret Service restrict the area. Um, but second issue argument I made was that even if the statute could be read as allowing anybody to restrict the area, it was still vague, still impermissible, unconstitutionally vague because the history of the statute. This statute has never apparently been used to prosecute anyone for entry or remaining into a restricted area that was restricted by anyone other than the Secret Service. You know that? Well, I've looked and I have found nothing. It's just I don't know that it's normal to be researching who restricted what as a prosecutor bringing one of these charges like I just don't think that would be something you'd be thinking about. Well, who restricted this area? Well, it's it's like what happened in the Bowie case that I cite, Bowie versus City of Columbia, where the protesters came into the restaurant and then someone hung up a no trespassing sign and the statute said trespassing means entry into a place and the court said you can't prosecute these people for trespassing because A, the statute doesn't cover it. But also the statute, the court explicitly said this interpretation, interpretation given the statute by the South Carolina Supreme Court had not the slightest support in prior South Carolina decisions. Now, there are no decisions that I could find that just because there are no decisions you could find doesn't mean that they've never brought a prosecution. Well, that's why I said that was not that's that's whatever. That's why I said apparently because well, why do we ask the words of the statute in this instance? It doesn't say that it has to be your honor. I do think that statute does address it. In fact, if you look at the only court that's addressed the issue, the Bursey case, that court read the statute as requiring Secret Service restriction. Well, that was a very different factual situation. Let me ask you. What about the evidence in this case that the signs that were posted did refer to the Secret Service? Your honor, I see that my time. You may answer my question. Thank you. Well, even if the signs referred to the Secret Service, the fact of the matter is that the statute requires that the property be restricted by someone and here that restriction was not put in place by the Secret Service, even if the signs. The statute is silent. Would you agree with that? The statute is of the statute. The text of the statute as the district court said the text of the restricted. So your client enters this area where the signs are posted and it refers to the Secret Service. What more was required under this statute? Well, your honor, I don't believe that factually that there is evidence that my signs were up when my client went in because those signs that there's evidence in a lot of these cases that those signs came down. They were trampled. Well, the fact that the rioters trampled them doesn't mean does it? That no one knew that. It was a restricted area. That isn't the argument you presented as I understand it. Well, the argument was there as you started to tell us as a journalist. Correct. They were all over the place. Some signs were up, some signs were down. Well, your honor, even if the statutes, even if the signs had said this area is restricted by the Secret Service, that apparently would not have been correct because the area had not been restricted by the Secret Service. It had been restricted by the Capitol Police. Well, that's not the argument you made. That's what I'm trying to focus on. And I think that's what my colleagues have been focusing on too. In looking at the district court's opinion, we are, as are you, confined to the arguments and the evidence that was presented. Yes. So you say it was vague. What I'm saying is that the statute required that that restriction be done by the Secret Service. But you have acknowledged that the statute does not say that. The statute does not explicitly say that.  So the statute says that it's a crime to knowingly enter or remain in any restricted building or grounds without lawful authority to do so, right? Yes. Text. So someone like Mr. Neely, where the evidence shows that he's standing in a crowd and the crowd faces a police barricade and they're pushing past a police barricade and passing the Trump 2020 sign down, basically using it kind of as a weapon to push back police officers, that person wouldn't be on notice that if they go past that area, they are entering restricted grounds, grounds that are being guarded by a police barricade. Your Honor, in that case, if the statute said that it was illegal to go past a police barrier or to knowingly go past a police barrier, they would be liable. But isn't that a clue that it's restricted if the police are cordoning it off and fighting physically to push people back from that area? Isn't that a clue that that might be a restricted area? But the question is who restricted it? Because even if it's restricted, if it's restricted by someone other than the Secret Service. Well, I'm assuming we don't buy that argument since it's not in the text. Then what's left? If you don't buy that argument, nothing's left, frankly. All right, your time is up. We'll give you a little bit on rebuttal. Let's hear from the government. Thank you, Your Honor. Good morning. Good morning. May it please the Court, Dietrich Hill on behalf of the United States. To pick up on the what the Court was just discussing, I do think that the defendant here is asking the Court to read into the statute something that just doesn't exist, which is a limitation that it only applies to restricted areas that have been restricted by the Secret Service. There's nothing in the statute that says that the court is not in a statute that suggests or supports that. Instead, the statute applies to any area that has been posted, cordoned off, or otherwise restricted. Any is an expansive term, and the Supreme Court has said that any should be read expansively, and that courts shouldn't generally be reading other language into the statute. Let me ask you. That's not inconsistent, is it, with an argument that, yes, it may have been restricted and posted, but that was done by some entity that had no authority to do so. Well, I don't think the defendant here is arguing that the entity that restricted it, which at the very least was the Capitol Police, didn't have the authority. The question instead, I think there's no dispute that the Capitol Police had the authority to restrict any part of the grounds. The question is just whether 1752 includes within its scope an area that's been restricted, certainly by the Capitol Police. And there's no reason to think it doesn't. That's entirely consistent with the language of the statute and its purpose, which, as the original Senate report said, is to extend a minimum of federal jurisdiction to cover any trespassing that threatens the president and subsequently the vice president or these special events of national significance. So this case is your understanding of the record that the signs that were posted were posted by the Capitol Police, having been advised that the Secret Service would be bringing the vice president to the Capitol for this official ceremony. And that's part A. And then part B would be, and the signs in fact referred to the Secret Service? To part A, I believe the signs were posted by the Capitol Police. And yes, they were aware there was communication between the Secret Service and the Capitol Police, making clear that the vice president was coming and that the ordinary procedures would be followed, which include restricting this whole area. To part B of the question, I don't believe that the signs that were posted at the perimeter actually referred to the Secret Service. I believe the perimeter sign said area closed by order of Capitol Police. So the Secret Service issue would not have been evident to a person upon first entering the perimeter. But of course, the defendant here has not challenged knowledge that the area was restricted or knowledge that the vice president was in the area. So that's not part of the challenge here. Thank you. With respect to the Webster issue and the change of venue, I would like to point out two things. One is that there's really no distinction here in terms of media coverage of Neely personally and Webster. Both Webster and Neely identified exactly two articles that refer to them and their potential involvement personally. And in fact, the articles about Webster referred to him at one point as an eye gouger, at another point noted that Webster was that a prosecutor had called him junkyard dog. So clearly there was some evidence that there could be personal knowledge or knowledge of this person's involvement. But again, as both of your honors have pointed out, the solution is more dear to determine whether a juror is aware of those articles. And the second thing is that the court in Webster noted that before you even look at the dissipation of prejudice over time, it's the defendant's obligation to show that there's prejudice in the first place, which the defendant didn't in Webster. And we think Neely has not here either. With respect to what about the distinction that the trial of Neely did take place while the House Select Committee hearings on January 6th were taking place. That's different from Webster. That is different. I don't think it's a material difference. I think at most it suggests that there's there could be less dissipation of prejudice, but I'm not sure I think it could cut either way because of course as the defendant concedes there was much less passage of time in Webster than in this case. And this is a trial before the court. And this is a trial before the court. Now we didn't so the defendant here has waived any opportunity to go through voir dire and then argue that the jury that was in fact seated. He says he opted for a bench trial because his venue motion was denied. That's right. Yeah, and we don't think that the defendant has waived the argument that the whole jury pool was so presumptively prejudiced that voir dire couldn't result in an impartial jury, but that's a much higher burden to me than just trying to show that particular jurors could not be chosen who were impartial. As this court pointed out in Webster, the Supreme Court has only accepted a claim of pervasive prejudice that doesn't even require voir dire. In one case, that's the Rideau case, which involved televising a murder confession repeatedly. So this case just is not comparable to that. So as a matter of the record in this case, were questions asked about the hearings? Were questions asked during trial? No, no, no, no, no, in terms of the voir dire of the jury before the trial. There was no voir dire in this case because the- Well, let me be clear then about the record in this case. I understood Judge Pan's question to say that Neely's physician was- he asked for a bench trial because he thought any pool would be so biased given the nature of the events here. That's my understanding as well. So here, and I realize this is outside the record, but presumably the court can take judicial notice or tell me if you think we can't. Not only were the television news programs continuously showing the events of January 6, not only continuously, maybe for that week and the next week. And I mean, you could not escape it. So that is a different scenario. Is it not? It's not the murder confession being shown every day. But this was clearly top-line news in this area and certainly on most of the national as well as the podcast events. I mean, the area was saturated with it is what I'm getting at. Yes. I certainly think any potential juror or almost any potential juror would be well aware of the events of January 6. But as this court pointed out in Webster, that doesn't necessarily mean that any juror has formed a particular belief about this defendant. And of course, if a potential juror had such strong feelings about January 6 that they could not sit as an impartial juror, again, that's something that Wardeer is designed to inquire about such that and, you know, the Defendant's Counsel would have the opportunity to explore each juror's view of January 6. And if you, I mean, this is outside the record, but certainly if you look at Wardeers that have occurred in other January 6 cases, that's obviously a hotly contested subject because there is pervasive media coverage. With respect to vagueness, I did want to point out that Bowie is different in that in Bowie, the state court that the Supreme Court was reversing had effectively added language to the statute. It said this trespassing statute that says you may not enter actually means you may not enter or remain. So by following the face of the statute, the defendants there had later been determined to violate the statute because it meant something different than it said on its face. Here, we're asking the court to apply the statute as it says on its face and it's the defendant who's asking the court to interpret it to mean something different. So the defendant can't really claim to be, to not have been on notice of what the statute said on its face. The other thing that I'd like to mention with respect to the meaning of 1752 in the restricted area is the very important context that in 2006, Congress added these special events of national significance to the definition of restricted area. Special events of national significance by definition involve many law enforcement agencies. And so it's not a sensible reading of the statute to try to add in this language suggesting that only a restricted area can only be set by the Secret Service and Congress has specifically included areas that involve many law enforcement agencies. It would only be sensible to include all of the restricted areas set by those law enforcement agencies as well within the definition of restricted area. If there are no further questions. Judge Rogers, do you have any further questions for the government? Thank you. Then we would ask the court to affirm. All right. Thank you, counsel. All right. Mr. Enzina, I believe your time was up. We'll give you two minutes. Your Honor, I'd like to start where my colleague started when he talked about the language of the statute and he said that the statute says that it is meant to apply to any restricted area. That's what the statute says. The statute says posted, cordoned off, or otherwise restricted. And earlier, your Honor asked me about suppose a defendant comes up to a phalanx of police officers and that's a clue to them that the area behind him is restricted. But let me posit a different scenario. Let's suppose you have a place like the hypothetical I've talked about in my brief about the Kennedy Center, a place where a Secret Service protectee is temporarily visiting and parts of it have been restricted by the Secret Service, but you have one lone cop standing in a hallway and he says to the gentleman comes up and says, I want to go down that hallway and the cop says, you can't, it's restricted. Why is it restricted? Because I said it's restricted. Is that a violation of the statute? Under the government's reading, it is. Because the government says, the district court said, the statute says nothing about who must do the restricting. So doesn't it imply that whoever's doing the restricting had authority to do it? Well, that supposes that there's some authority that restricts the ability of someone to declare an area restricted. Well, there are other statutes other than this one that confer authority on Capitol Police, for example, to control the grounds of the Capitol. Sure. So you don't dispute that they had authority to restrict? No, no, no, that's not my question. That's not my argument. My argument though is that under the government's reading of the statute, which is incredibly broad, any police officer can declare anything restricted. And my question is, why is that an implication of the government's reading? It implies that whoever restricted this area had authority to do so because there are other statutory provisions that provide such authority. Well, Your Honor, I think those are two different questions. One is, does an agency have authority to restrict an area? Now, what that does not mean that no one in the world has authority to declare something restricted. Right? So we're looking at a statute that says, that just talks about restricted areas without saying who should restrict them. And you're saying we should assume that if it doesn't say who's restricting them, then everybody must restrict them. And I'm just saying, I don't know why we should assume that because there are lots of other statutes that deal with authority to restrict things. But we're not talking about statutes that say that nobody else can restrict something. But you're asking us to make an assumption that anybody can restrict, and I don't see why we need to make that assumption. Well, that's what the government argues. The government says, any restriction. No, it's a restricted area, and they're saying it doesn't speak to who can do the restricting. And their argument is, the assumption is, whoever's doing the restricting had authority to do it. And I don't see why that's not true. Well, suppose someone comes into a deli. Suppose the president walks into a deli to buy a Coke, and the security guard in the deli says to a person, you can't go over there, it's restricted. Is he committed a crime if he goes over there? Security officer has authority in that deli. Maybe he has. So has that individual committed a crime if he steps into the area that the security guard has declared restricted? Under the government's view, he does. He has. What's wrong with that? What's wrong with that is that it means that anybody... No, not anybody. The security guard had authority to restrict. The security guard presumably is hired by the premises. I couldn't call the premises. So what that means is... Maybe the security guard says, while the president is in here, like, we're not going to let other people come in right now. So what that means is that private citizens have the authority to set the scope of this criminal statute. The security guard is somebody with authority. It's not just anybody in the deli. You're making an as-applied vagueness challenge, a constitutional challenge, right? That's what this argument is. I mean, there are unlawful entry trespassing type statutes that are in every jurisdiction. They're prosecuted every day. One of the elements is always, is the person on notice that they either have to leave and they can't remain in the area, or were they on notice that they could not enter the area? That's just common to all of these statutes. And it doesn't, the statutes don't say specifically by who. It's presumed that the notice is by someone with authority. And if you were notified and it was, and you should have reasonably believed that someone with authority notified you, then you violated the statute and there's no vagueness issue. I mean, those statutes are prosecuted every day of the week, twice on Sundays, right? What's the vagueness problem there? Your Honor, those statutes, the trespassing statutes, breaking and entering statutes, and so on, they rely on the notion that the property that's being intruded upon is owned by someone who does not want you there. And that's different from the notion that anybody can restrict it. All I'm saying to you is that an argument about whether someone has the power or legal authority to restrict the statute is different than a vagueness problem. You could argue they didn't have the authority to restrict it and therefore we didn't violate the statute because they didn't have any right to restrict it in the first place. That's not your argument. Well, your argument is a vagueness argument. Respectfully, Your Honor, I've made both arguments. Well, that first argument isn't a vagueness argument. No, it's not. It's a question of what the statute requires. And the issue is, as we've said, the statute does not currently explicitly say that restriction must be done by the Secret Service. Okay. And I'm saying if we don't buy that argument, then it's no longer relevant.  In the vagueness sphere, whether it's the Secret Service or whomever who has restricted it as far as the void for vagueness as applied argument goes, right? No, Your Honor. Respectfully, it is still relevant because the issue with respect to vagueness is my argument is based on the history of the statute, history of its use. As I said, I don't believe it has ever been used to prosecute someone who entered into a restricted area that was restricted by anyone other than the Secret Service. And that's where the vagueness comes from. It's not from the statute itself. It's from the use of the statute, the history of the statute. All right. I think we have your argument. We'll take the matter under advisement. Thank you, Your Honor.
judges: Wilkins; Pan; Rogers